IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMANTHA J. AMIG, | : | Civil No. 1:19-CV-00408 |
| Plaintiff, | : | |
| v. | : | |
| COUNTY OF JUNIATA, *et al.*, | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court is a motion for summary judgment filed by Defendants, Mifflin County ("County"), Joshua Garver ("Warden Garver"), and Thomas Stalnaker ("Stalnaker") (collectively, "the County Defendants"). (Doc. 51.) For the reasons that follow, the court will grant the motion.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

The Mifflin County Correctional Facility ("MCCF") houses Juniata County inmates pursuant to a contract between Mifflin County and Juniata County. (Doc. 52, ¶ 1; Doc. 52-1.) Pursuant to that contract, Juniata County pays Mifflin County a *per diem* fee for each Juniata County inmate housed in the MCCF. (Doc. 52, ¶ 2; Doc. 52-1, p. 7.) The contract does not provide for a different rate when the inmate is in the Restrictive Housing Unit ("RHU"). (Doc. 52, ¶ 3; Doc. 52-1, p.

---

[1] In considering Defendants' motion for summary judgment, the court relied on the uncontested facts, or where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to the nonmoving party in accordance with the relevant standard for deciding a motion for summary judgment. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

1

7.)[2]  At all times relevant to this lawsuit, Amig was a Juniata County inmate who was imprisoned in the MCCF as part of an intermediate punishment sentence she received in Juniata County.  (Doc. 52, ¶ 4.)  Amig was employed as a receptionist prior to her incarceration and was granted work release as part of her sentence.  (*Id.* ¶ 5.)

As part of the approval process for the work release program, Amig met with MCCF officials and executed a Work Release Authorization and an Acknowledgement regarding the MCCF Work Release Program Rules.  (*Id.* ¶ 6; Doc. 52-3.)  These forms stated that work release inmates would be subject to random drug testing.  (Doc. 52, ¶ 7; Doc. 52-3, pp. 1, 3.)  The Acknowledgement form that Plaintiff signed also stated that: "You will remain at your place of employment/destination at all times and will not leave there until it is time to return to MCCF."  (Doc. 52, ¶ 8; Doc. 52-3, p. 3.)

On Monday, February 19, 2018, Amig went to work, but was feeling ill.  (Doc. 52, ¶ 10.)  Amig asserts that she was not feeling well during the preceding

---

[2] Amig responds to this statement in the County Defendant's statement of material facts by admitting that at the time of her incarceration (February and March of 2018), the operative contract did not distinguish between the RHU and general population for housing purposes, but the January 2018 billing sheet for out-of-county inmates still showed a column indicating a higher rate for RHU status versus general population status.  (Doc. 56, ¶ 3.)  Amig notes that this column does not appear in the February and March statements.  (*Id.*; Doc. 56-3.)  The court notes, however, that only the January 2018 billing statement has been provided and no inmates were billed at the increased RHU rate in January.  In any event, it is undisputed that the contract did not provide for an increased rate for RHU inmates during the period of Amig's incarceration.

weekend and that she told a corrections officer. (Doc. 56, ¶ 12.) However, it is undisputed that she did not submit a sick call request to be seen by the MCCF medical staff. (Doc. 52, ¶ 11.) Shortly after arriving at work on the morning of February 19, Amig called her father and asked him to schedule a doctor's appointment for her. (*Id.* ¶ 12.) Amig's father's attempted to call Stalnaker, the Work Release Coordinator, but was unable to reach him by phone. (*Id.* ¶ 13.) Amig's father did not attempt to contact anyone else at the MCCF[3] and scheduled a doctor's appointment for Amig later that afternoon. (*Id.* ¶ 14.) However, soon thereafter, Amig called her father again and asked him to take her to the emergency room. (*Id.* ¶ 15.) Amig's father picked her up at her place of employment and took her to the hospital. (*Id.* ¶ 16.)

At the hospital, Amig was diagnosed with dehydration and a sinus infection. (*Id.* ¶ 17.) She was given fluids and prescribed medication before she was discharged in the afternoon. (*Id.*) Amig's father then transported her back to her place of employment, where she completed her scheduled shift before returning to the MCCF. (*Id.* ¶ 18.) It is disputed whether Amig notified any MCCF staff members of her trip to the hospital upon her return that evening. (Doc. 52, ¶ 20; Doc. 56, ¶ 20.)

---

[3] Amig notes that her father did not attempt to contact anyone else because Stalnaker had previously advised that he was the sole point of contact for all matters relating to work release, a point which the County Defendants dispute. (Doc. 56, ¶ 14; Doc. 25, ¶¶ 21–22.)

Two days later, on February 21, 2018, Amig returned from work and officials administered a random urine test. (Doc. 52, ¶ 21.) The test indicated positive findings for Suboxone and methamphetamine. (*Id.* ¶ 22.) As a result, Amig was issued a misconduct, she was transferred to the RHU, and removed from work release. (*Id.* ¶ 23.) After she was moved to the RHU, MCCF officials administered two additional urine tests, both of which likewise indicated positive findings for Suboxone and methamphetamine. (*Id.* ¶¶ 24–25.) Amig called her father the evening of the first test to notify him of what happened and her father then undertook repeated efforts to challenge the results of the test, including contacting the American Civil Liberties Union, the Attorney General of Pennsylvania, and the President Judge of Juniata County. (*Id.* ¶ 26.)

According to Garver's testimony, prior practice at the MCCF was when a work release inmate submitted a urine specimen that was positive, the sample would be sent to the lab to confirm the result, but that practice proved too costly. (Doc. 56, ¶ 27; Doc. 56-1, pp. 31–35.) During the relevant time period, however, the practice at the MCCF was that staff would only send a sample to the lab for verification if an inmate requested that it be sent to the lab and paid the fee. (Doc. 56, ¶ 27; Doc. 56-1, pp. 35–37.) Ultimately, the MCCF sent Amig's tests for outside laboratory testing. (Doc. 52, ¶ 27.)

The lab results returned a negative finding, which was reported to the MCCF on March 1, 2018. (Doc. 56, ¶ 28; Doc. 56-4.) At the disciplinary hearing held on March 7, 2018, Amig was found not guilty of the misconduct she was issued for the failed drug tests. (Doc. 52, ¶ 28.) However, the previous day, March 6, 2018, Stalnaker issued a second misconduct against Amig for leaving work release without prior approval pursuant to the work release rules. (*Id.* ¶ 29; Doc. 52-6, p. 2.) Amig asserts that the purpose of the second misconduct was to keep Amig off of work release, whereas the County Defendants assert that it was a violation of the work release rules and the misconduct was issued because Amig and her father did not receive prior approval for the hospital visit, nor did Amig notify anyone upon her return to the MCCF that evening. (Doc. 52, ¶ 31; Doc. 56, ¶ 31.) In any event, Amig was found guilty of the second misconduct. (Doc. 52, ¶ 32.) As a result, Amig lost her work release privileges, although it is undisputed that she had already been removed from work release following the first failed drug test and that her employer terminated her employment within a day of that first failed test. (*Id.* ¶ 33.) Amig completed her term of incarceration and was ultimately released to house arrest in accordance with her intermediate punishment sentence. (*Id.* ¶ 34.)

Amig initiated this action by filing a complaint on March 6, 2019. (Doc. 1.) The County Defendants responded with a motion to dismiss and supporting brief

filed on April 30, 2019. (Docs. 13, 14.) Amig filed an amended complaint, which is now the operative complaint, on May 21, 2019. (Doc. 16.) In her amended complaint, Amig raised eight claims pursuant to 42 U.S.C. § 1983, as well as a claim for product liability. (*Id.*) The County Defendants filed a new motion to dismiss on June 3, 2019. (Doc. 20.) On July 8, 2019, the motion was granted in part and denied in part. (Doc. 24.) Amig also filed a notice of voluntary dismissal as to Defendant Premier Biotech on August 28, 2020. (Doc. 43.) Thus, there are three claims remaining in this case: (1) a *Monell*[4] claim against Mifflin County premised upon the underlying equal protection claim (count II of the amended complaint); (2) a supervisory liability claim against Garver premised upon the underlying equal protection claim (count IV of the amended complaint, incorrectly labeled as Count III); and (3) an equal protection claim against Stalnaker based on allegation of disparate treatment as between in-county and out-of-county inmates (count V of the amended complaint, incorrectly labeled as count IV). (Docs. 16, 24.)

The County Defendants filed the instant motion for summary judgment, a statement of undisputed material facts, and a brief in support on June 1, 2021. (Docs. 51, 52, & 53.) Amig filed a responsive concise statement of material facts

---

[4] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978) (holding that a municipality may be found liable in a Section 1983 claim for a constitutional violation caused by some policy or custom of the municipality).

along with a brief in opposition on July 6, 2021. (Docs. 56, 57.) The County Defendants timely filed a reply brief on August 2, 2021.[5] (Doc. 60.) This motion is therefore ripe for disposition.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for resolving a summary judgment motion. Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986). A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law, and is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party" and draw all reasonable inferences in favor of the same. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *See Celotex*, 477 U.S. at 324. "Once the moving

---

[5] On August 2, 2021, this case was reassigned to the undersigned.

party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).  The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).  Further, the non-moving party cannot rely on "general denials or vague statements." *Shaeffer v. Schamp*, No. 06-1516, 2008 WL 2553474, at *4 (W.D. Pa. June 25, 2008) (quoting *Trap Rock Indus. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992)).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23.  "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989)).

## DISCUSSION

In the motion for summary judgment, the County Defendants assert one overarching argument as to all three claims—namely, that there is no evidence from which a jury could reasonably infer that Amig was subjected to disparate treatment as an out-of-county inmate relative to in-county inmates following a failed drug test while on work release. (Doc. 53, pp. 9–16.) Specifically, the County Defendants point to the lack of admissible evidence that similarly situated in-county inmates received more favorable treatment than Amig. (*Id.*, at 11–12.) Without being able to prove disparate treatment, the County Defendants argue that Amig's equal protection claim against Stalnaker fails, and because there is no underlying constitutional violation as to Mifflin County and Garver, the *Monell* and supervisory liability claims against them likewise fail. (*Id.*, at 9–16.)

In response, Amig argues that she has established all of the elements necessary to state a class-of-one equal protection claim: that she suffered more severe punishment for purportedly failing a drug test on work release than similarly situated comparators, including in-county inmate Alisha Aumiller; that Stalnaker acted intentionally; and that there was no rational basis for this disparate treatment. (Doc. 57, pp. 6–8.) Amig also offers an additional piece of evidence to support her claim—that she witnessed Stalnaker immediately package and send another inmate's sample that tested positive to go to the laboratory. (*Id.* at 7–8.)

9

In response, the County Defendants' contend that this allegation, like the testimony surrounding Aumiller's treatment, is insufficient to survive a motion for summary judgment, especially where Amig has not identified the inmate with any meaningful detail, including whether he was an in-county or out-of-county inmate, and whether he was part of the work release program. (Doc. 60, p. 6.)

To sustain a "class of one" equal protection claim, a plaintiff must allege that "(1) the defendant treated him differently than others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006); *see also Village of Willowbrook v. Olech*, 58 U.S. 562, 562 (2000). The County Defendants' arguments focus on the first element. Amig has asserted that she has met her burden on the first element through the following: her testimony that she received more severe punishment for purportedly failing a drug test on work release than similar situated comparators; the testimony of Thomas Berrier ("Berrier"), an out-of-county inmate who was similarly removed from work release, issued a misconduct charge, and placed in the RHU after purportedly failing a drug test; the fact that Alisha Aumiller, an in-county inmate, experienced no such adverse actions despite multiple failed drug tests showing positive results for fentanyl; and Amig's testimony that she witnessed Stalnaker immediately

package and send another (unidentified) inmate's positive urine sample to send to the laboratory.

The court notes that Amig did not provide any information as to how the information relating to Alisha Aumiller's treatment while incarcerated in the MCCF would be admissible, given the County Defendants' contention that Amig's conversation with other inmates about Aumiller and her conversation with Aumiller herself would be inadmissible hearsay, to which Amig has not responded. Aumiller refused to comply with a subpoena deposition, Amig was unable to contact Aumiller to voluntarily appear for a deposition, and there are no documents in the record detailing the course of Aumiller's incarceration at the MCCF. (Doc. 52, ¶ 40; Doc. 59, ¶ 40.) Amig concedes that the only evidence relating to Aumiller's incarceration is contained in Amig's own discovery responses and deposition testimony. (Doc. 52, ¶ 41–44; Doc. 59, ¶ 41–44.) The court agrees that this evidence is inadmissible hearsay and is not sufficient to satisfy Plaintiff's burden.

Amig's testimony that she observed another unidentified inmate's urine specimen being sent directly to the lab, even viewed in the light most favorable to Amig, is not sufficient to establish that other similarly-situated individuals, namely in-county inmates at the MCCF, were treated more favorably than she was. Amig

has not asserted that this unidentified inmate was on work release, nor has she asserted that he was an in-county inmate.

Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23.  Further, the non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Saldana*, 260 F.3d at 232.  Amig has not made such a showing here.  She replies upon her own testimony about how she was treated, the testimony of Berrier, who was treated similarly to her, [6] and her own testimony about observing the treatment of an unspecified inmate whom she has not established was similarly situated.  Amig has not provided any admissible evidence from which a reasonable juror could infer that in-county inmates were treated more favorably than Amig as an out-of-county inmate.  Additionally, Stalnaker testified in his deposition that any work release inmate who initially provided a baseline negative drug test would be immediately pulled from work release after a positive drug test.  (Doc. 52, ¶ 54.)  He also noted that issuing a misconduct and placing the

---

[6] Interestingly, Berrier, also stated in his deposition that his cellmate in the RHU, Frankie Wilt, was a trustee and similarly had his privileges revoked based on a failed drug test because it was sent out and came back negative.  (Doc. 52, ¶ 51.)  Berrier further stated that he believed Frankie Wilt was an in-county inmate.  (*Id.* ¶ 52.)

inmate in the RHU would be part of the usual consequences of an inmate who failed a drug test under those circumstances. (*Id.* ¶ 55.) Furthermore, Garver stated the same in his deposition. (Doc. 56-1, pp. 36–37.) Amig has not offered admissible evidence to show a dispute as to this material fact. Accordingly, the County Defendants are entitled to summary judgment on these claims and their motion will be granted.[7]

## CONCLUSION

For the foregoing reasons, the court will grant the County Defendants' motion for summary judgment. (Doc. 51.) An appropriate order will issue.

s/Jennifer P. Wilson<br>
JENNIFER P. WILSON<br>
United States District Court Judge<br>
Middle District of Pennsylvania

Dated: July 18, 2022

---

[7] The theory of the supervisory claim against Garner is premised on a finding that a supervisor, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directed or caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). The underlying constitutional harm Amig alleged in the complaint is an equal protection claim. Because the court finds no equal protection violation, there can be no supervisory liability.

Likewise, it is well-established that a litigant cannot advance a *Monell* claim against a municipal entity in the absence of an underlying constitutional violation. *See Johnson v. City of Phila.*, 837 F.3d 343, 354 (3d Cir. 2016); *see also Grazier ex rel. White v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003).